IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case no.:  6:13-md-2398-Orl-37GJK

| | | |
|---|---|---|
| In Re: | ) | Orlando, Florida |
| MDL 2398 Enhanced Recovery | ) | February 26, 2013 |
| Company, LLC Telephone Consumer | ) | 10:00 a.m. |
| Protection Act Litigation | ) | |

Transcript of initial status conference

before the Honorable Roy B. Dalton, Jr.

United States District Judge

and the Honorable Gregory J. Kelly

United States Magistrate Judge


Appearances:

Counsel for Plaintiffs:   Scott David Owens
                          James. O. Latturner.
                          Curtis Charles Warner
                          Brian J. Trenz
                          David P. Schafer


Counsel for Defendants:  James Kevin Schultz
                         Michele Martin
                         Kevin S. Ranlett


Court Reporter:         Diane C. Peede, RMR, CRR
                        United States Courthouse
                        401 West Central Blvd., #4600
                        Orlando, Florida  32801
                        (407) 615-0305

Proceedings recorded by mechanical stenography, transcript
produced by computer.

2

1                    P R O C E E D I N G S

2            JUDGE DALTON:  Good morning.  We're here on In re:

3    Enhanced Recovery Company, LLC, Multi-District Litigation

4    Case Number 6:13-md-2398.

5            Counsel, if I could get your appearances for the

6    record, please.

7            MR. OWENS:  Scott Owens for the plaintiff.

8            MR. WARNER:  Curtis Warner for the Plaintiff Tang.

9            MR. LATTURNER:  James Latturner for Plaintiff

10   Soppet.

11           JUDGE DALTON:  Is it La-tur-ner?

12           MR. LATTURNER:  La-tur-ner.

13           JUDGE DALTON:  All right.  Thank you.

14           MR. SCHAFER:  David Schafer for Latasha Blake.

15           JUDGE DALTON:  All right.  Mr. Schafer.

16           MR. TRENZ:  Brian Trenz for Plaintiff Blake.

17           JUDGE DALTON:  All right.  Good morning, Mr. Trenz.

18           MR. SCHULTZ:  Good morning, Your Honor.  Jim

19   Schultz on behalf of Enhanced Recovery Company.

20           JUDGE DALTON:  Mr. Schultz.

21           MS. MARTIN:  Michele Martin on behalf of Enhanced

22   Recovery Company.

23           JUDGE DALTON:  Hello, Ms. Martin.

24           MR. RANLETT:  Kevin Ranlett on behalf of Illinois

25   Bell Telephone company.

1          JUDGE DALTON:  All right.  Mr. Ranlett, you're here

2     for your colleague, who's off having a baby?

3          MR. RANLETT:  I am.  And thank you, Your Honor.

4          JUDGE DALTON:  All right.  You're very welcome.

5          Well, as you all know, these cases have been

6     collected from around the country and sent here by the panel

7     on multi-district litigation, and the purpose of our meeting

8     this morning is to try to see where we are in connection with

9     status, to try to make some decisions about the

10    responsibility, allegation of responsibility amongst the

11    lawyers in terms of moving forward and to get some feedback

12    from you all with respect to where you are with respect to

13    discovery in your various cases.

14         I've asked Judge Kelly to join us, because he'll be

15    the magistrate judge responsible for handling any of the

16    discovery issues, and I wanted to make sure that he had an

17    opportunity to ask you any questions or to hear from you

18    about where you all think you are in terms of discovery.

19         A couple of questions, I guess, initially.  Who's

20    here on behalf of the Drinning-Duffee case?

21         MR. OWENS:  That's myself, Your Honor, Scott Owens.

22         JUDGE DALTON:  All right.  Mr. Owens, how about

23    coming to the podium, if you would, please, and tell me a

24    little bit about your case.  I didn't get a status briefing

25    from you.  So I'm trying to figure out where you are in this

4

1   mix.

2          MR. OWENS:  Well, Your Honor, we are very early on

3   in the case; and I anticipate, along with my co-counsel, that

4   we'll be filing a consolidated complaint to incorporate the

5   claims of Wanett Drinning-Duffee.

6          JUDGE DALTON:  All right.  Are you going to be

7   making a request, do you suspect, for class certification in

8   your case?

9          MR. OWENS:  Yes, Your Honor, and I'm also here as

10  liaison counsel for the plaintiffs collectively; and we

11  anticipate, on behalf of the putative class, that we'll be

12  making various motions, specifically related to local Rule

13  4.04, to move the class cert deadline beyond the typical time

14  frame.

15         JUDGE DALTON:  All right.  Let's not get ahead of

16  the game.  I'm going to talk about -- as I said, I need to

17  get a little bit more information from you so I can make some

18  determinations about lead counsel and liaison counsel.

19         I notice that you all basically decided that you'd

20  all do it, and I'm not sure that's going to work out.  I say

21  that somewhat facetiously; but I notice that everybody wants

22  to be a co-lead, co-liaison, and we may have to sort through

23  that a little bit.

24         My primary goal is to make sure that, amongst all

25  of the talent that we have here in the room, that we have a

1    designated spokesperson that the Court can look to to take

2    the lead on making arguments on substantive matters and that

3    we also have designated liaison counsel.  Even though this is

4    a relatively small group of cases, I want to make sure that

5    we have good communication between the plaintiffs and the

6    defendants in terms of what needs to be done so that we can

7    do it in an efficient way.

8         I appreciate what you've had to say, Mr. Owens,

9    about the timing of Drinning-Duffee, and that helps me a

10   little bit.

11        While you're there at the podium, and I'm happy to

12   hear from some of the other plaintiffs' lawyers, but tell me

13   what you all envision in terms of the organization as far as

14   speaking as a group and working with the defendants.

15        MR. OWENS:  Well, I believe the tentative plan

16   would be Mr. Latturner would be taking lead on behalf of the

17   putative class -- classes and interacting with myself

18   respectively as liaison counsel.

19        I'm located in South Florida.  So, as far as having

20   a presence here in the Middle District, it's not inconvenient

21   to my practice to come up here and make -- relate the status

22   of certain matters to the court or to appear in person, if

23   such is required.

24        JUDGE DALTON:  Okay.  Mr. Latturner, let me hear a

25   little bit from you.  If you don't mind coming to the podium,

1  tell me a little bit about yourself, your practice, your

2  involvement in this case, and your familiarity with

3  multi-district litigation.

4            MR. LATTURNER:  I'm with the firm of Edelman,

5  Combs, Latturner and Goodwin in Chicago.  Our basic practice

6  is consumer class actions.

7            With regard to this case, we, along with Mr.

8  Warner, have been litigating the case of Soppet and Tang

9  against Enhanced Recovery and have brought in AT&T.

10            JUDGE DALTON:  Remind me to come back to that, by

11  the way.  I want to ask you some questions about the AT&T

12  matter.

13            MR. LATTURNER:  Okay.  The Enhanced Recovery moved

14  for summary judgment before the district court in Chicago, it

15  was denied.  They asked for an interlocutory appeal to the

16  Seventh Circuit, which was taken.

17            We argued that case in the Seventh Circuit and the

18  Seventh Circuit upheld the denial of the motion for summary

19  judgment and sent it back, and that's when it became part of

20  the MDL proceeding.  So we are very familiar with the case.

21            JUDGE DALTON:  What was the issue on summary

22  judgment, in a nutshell?

23            MR. LATTURNER:  The issue on summary judgment was

24  they called the wrong person.  In other words, the debtor

25  that they were trying to contact who had given them the

1    number --

2             JUDGE DALTON:   I remember now.   They re-assigned

3    the telephone number or something like that?

4             MR. LATTURNER:   Pardon?

5             JUDGE DALTON:   They re-assigned the telephone

6    number or something like that?

7             MR. LATTURNER:   They reassigned the telephone

8    number and our people, Soppet and Tang, picked it up and then

9    they called them.   So the question was, who is the called

10   party?   And they said the called party is the one who had the

11   number.

12            JUDGE DALTON:   Okay.

13            MR. LATTURNER:   We've prosecuted many class

14   actions, including several that have been MDL'ed.   We have

15   two other T.C.P.A. multi-district class actions going, now

16   pending in California, against Midland and Portfolio

17   Recovery.

18            We, in our petition for lead counsel, put all the

19   cases that we have been on.   They are extremely numerous.

20   We've argued significantly in the Seventh Circuit as well as

21   other circuits with regard to consumer cases.

22            JUDGE DALTON:   All right.   Thank you, Mr.

23   Latturner.

24            Mr. Trenz, Mr. Schafer, do you all have any issues

25   with respect to Mr. Latturner serving as lead counsel?   Are

1   you in agreement with that or opposed to it?

2            MR. LATTURNER:  May I interject for a moment?  Our

3   agreement would be, if the Court would approve, that Mr.

4   Schafer and I would be co-lead counsel.  We've been working

5   with him on the case, but I now leave it up to him.

6            JUDGE DALTON:  And I appreciate that.  Let me hear

7   from Mr. Schafer a little bit.  I want to try to figure out

8   whether or not it makes sense, quite honestly, Mr. Latturner,

9   to have two of you as co-lead counsel as opposed to one

10  person that the Court could look to.

11           So tell me what your view of that is, Mr. Schafer.

12           MR. SCHAFER:  Well, our discussions resolved around

13  the fact that we'd actually taken our case further along than

14  they had.

15           JUDGE DALTON:  You're in the Blake case; is that

16  right?

17           MR. SCHAFER:  Yes.  So we'd already moved for

18  certification when the MDL panel took the case.

19           JUDGE DALTON:  Right.

20           MR. SCHAFER:  So we've been able to give guidance

21  on how we're going to move forward on this, because we've

22  already gotten there.  We're already done our cert motion.

23  So that's why we thought that being co-lead counsel would

24  make sense.

25           JUDGE DALTON:  Okay.  Let me ask you this while

1    you're there.  Stay there for just a second.  We'll jump

2    around for a minute.

3            Mr. Latturner, tell me a little bit about AT&T's

4    presence in this lawsuit.  I confess that I'm curious as to,

5    why is AT&T in the case?  What does that do for you?  From

6    the plaintiffs' perspective, how does that improve your

7    situation?

8            I assume that you added them because you think it

9    has improved your situation.  Maybe that's an unfair

10   assumption.

11           MR. LATTURNER:  Why it improves our situation?

12   It -- it certainly makes settlement easier because there is

13   an additional pot of money.

14           With regard to the issue of why they were brought

15   in, they were the ones that put the case into play by having

16   Enhanced Recovery act as their agent to collect the debt, and

17   AT&T would be responsible for what they did.

18           The Seventh Circuit in the Soppet decision

19   commented on that and indicated that they would be a proper

20   party at a time when they were not in the case.  We then

21   filed an Amended Complaint and added them.

22           JUDGE DALTON:  Okay.  Let me ask -- is it Mr.

23   Ranlett?

24           MR. RANLETT:  Ranlett, yes, sir.

25           JUDGE DALTON:  I'm sorry.  Mr. Ranlett, will you

1   come to the podium, and from AT&T's perspective, tell me

2   whether or not you think that you all have issues that are --

3   obviously, you have issues that are individual to AT&T, since

4   you're only appearing in one case; but tell me whether or not

5   you think that's going to be an impediment to the Court's

6   management of the case as an MDL.  I'm curious as to whether

7   or not you think AT&T has defenses that are independent of

8   defenses that might be asserted by E.R.C.

9              MR. RANLETT:  We do, Your Honor.  AT&T has a

10   threshold issue that it would like to raise.  AT&T will be

11   renewing in this court the motion to compel arbitration with

12   respect to the plaintiffs in the Soppet case that AT&T had

13   filed before transfer.  That's an issue that's distinct from

14   the other issues in this case.

15              JUDGE DALTON:  Procedurally, if the Court were

16   persuaded -- and I don't know that I am, but if the Court

17   were persuaded that your motion to compel arbitration was

18   well taken, would it be AT&T's position that the action

19   against it should be stayed or severed from the E.R.C.

20   proceeding pending the outcome of the arbitration?

21              MR. RANLETT:  Yes, Your Honor.  The Federal

22   Arbitration Act gives clear guidance about what to do in this

23   situation.  Section 3 of that act, 9, U.S.C., Section 3, says

24   when a court concludes that an issue before it is arbitrable,

25   upon the request of any of the parties, the Court should stay

1  the claims that are arbitrable and send them to arbitration.

2          So, Your Honor, if the Court were indeed to grant

3  AT&T's motion to compel arbitration, we agree that the claims

4  against AT&T could be stayed.

5          JUDGE DALTON:  Okay.  Thank you very much.

6          MR. RANLETT:  Thank you, Your Honor.

7          JUDGE DALTON:  Ms. Martin and Mr. Schultz.  Ms.

8  Martin, do you mind coming to the podium and address for me,

9  from the defense perspective, what is your view of management

10 of the case from the defense side?

11         MS. MARTIN:  From the defense side, me and

12 co-counsel have been working on these cases together.

13         We have an insurance issue, Your Honor, which

14 E.R.C. had one insurance carrier halfway through the Blake

15 and the Soppet case.  They have now changed insurance

16 carriers.

17         Co-counsel was the preferred attorney on those

18 cases under that insurance carrier.  They've now changed it

19 and I have become counsel on the Aumick and the Phillipson

20 and the Drinning-Duffee case.

21         So we have an issue from the insurance perspective

22 and E.R.C.'s perspective that they would like us to go

23 forward as co-counsel, because co-counsel is representing

24 E.R.C. on some of these matters and I am on other matters.

25         JUDGE DALTON:  You're in Jacksonville; is that

 1   right, Ms. Martin?

 2            MS. MARTIN:  Yes, Your Honor.

 3            JUDGE DALTON:  Where are you, Mr. Schultz?

 4            MR. SCHULTZ:  I'm in Chicago, Your Honor.

 5            JUDGE DALTON:  Chicago?

 6            MR. SCHULTZ:  Yes, Your Honor.

 7            JUDGE DALTON:  So you've been involved in the

 8   Soppet case?

 9            MR. SCHULTZ:  Yes, Your Honor, we were responsible

10   for losing the case in the Seventh Circuit.

11            JUDGE DALTON:  Okay.

12            Mr. Schafer, let me ask you, invite you back up.  I

13   know that you all have done some -- you are farthest along in

14   terms of your discovery.  I guess the discovery in the Blake

15   case is concluded as far as the class certification issue is

16   concerned.

17            One of the concerns that I have in terms of looking

18   at the briefings -- and, of course, these other parties have

19   not yet had a chance to comprehensively brief the issue, and

20   we'll talk about that in a minute; but I know that when this

21   case was in its early stages, I had expressed some concerns

22   about whether or not this issue of consent was an element of

23   the offense or an element of the claim, that is, or an

24   affirmative defense, and you all have briefed that and I'm

25   appreciative of that.

1      The defendants have raised the issue that,

2   regardless of whether it's an affirmative defense or an

3   element of the claim, that you can't establish commonality

4   without addressing the consent issue.  So I'm interested in

5   hearing from you as to whether or not you all have in place

6   or at least a plan for putting in place some sort of viable

7   option to present to the Court as to how it is that you're

8   going to solve the commonality problem, in light of this

9   issue of consent.

10      MR. SCHAFER:  I might have to bring Mr. Trenz up,

11   because I think he's been working on that issue.

12      JUDGE DALTON:  Okay.

13      Mr. Trenz, do you want to come up and address that

14   for me.

15      And since we're here at the status conference, I'm

16   absolutely comfortable doing it this way, but this is the

17   type of thing that, as you can see going forward, if we're

18   going to have a substantive herring on the matter, whoever is

19   going to be designated as lead counsel is going to be

20   responsible for being fully informed and able to discuss any

21   of the matters that are before the Court.

22      I know that goes without saying, but I just want to

23   make sure that we all get the message here today that when

24   the Court conducts a hearing, lead counsel is going to be

25   responsible for being knowledgeable about all of these

1    subjects.

2              With that said had, Mr. Trenz, let me hear from

3    you.  What's the plaintiffs' plan?

4              MR. TRENZ:  Well, Your Honor, I believe because our

5    certification motion was already -- should I say our renewed

6    certification motion was filed, I think that that was pretty

7    much our plan.

8              I guess there are two basic elements.  The first is

9    that the defendant simply doesn't have any proof that it even

10   tried to gain consent; and because the T.C.P.A. has a

11   negligence statute and because the deposition testimony,

12   which I think the Court and, I believe, Judge Dalton you've

13   had some of that in the record, I think the deposition

14   testimony sets out that there just simply isn't proof of any

15   consent.  There was never a process to obtain consent; and

16   that even when depositions were taken of compliance officers,

17   there was never any kind of way to obtain consent or even

18   check a consent happened.

19             In fact, when the records were obtained by E.R.C.

20   and when E.R.C. actually skiptraced to get new numbers, these

21   numbers, they had no record of where they came from.  So

22   essentially what the deposition testimony set out was that

23   E.R.C. has these millions and millions of cellular telephone

24   numbers.  They can't tell where they came from.  They have no

25   proof of how they got them, and they don't know if they were

ever obtained -- they can't even tell you if they were given

to them by AT&T, if they were given to them by the skiptrace.

They can't tell you if they called the guy's relative and the

guy's relative said, "Hey, this is where you can reach him."

So the issue of this affirmative defense or defense of

consent is really a non-issue.

Legally, I think some of the circuits are split;

but we would still say that legally the issue is something

that we still believe that we can win on, but factually, it's

just a non-issue.  Even after the Court gave E.R.C. another

two months to do class discovery and present more evidence to

the Court to show that consent was an issue, to show that

they could prove consent was an issue, they still couldn't.

They have no idea where the numbers came from, and their

deposition testimony says the same.

JUDGE DALTON:  Well, I guess what prompts the

question is, and I confess that I've not studied the briefing

in detail, but I want to at least share with you some of the

concerns that I have in looking at it.

I notice that this Fifth Circuit case that the --

I've forgotten the name of it, but the Fifth Circuit case

that the defendants relied on where the district court

certified the class; and the Fifth Circuit then reversed the

district court, based on a finding that the plaintiffs had

failed to establish commonality, that it was not material

whether the consent issue was an affirmative defense or whether it was an element of the claim, but that in order to establish commonality for purposes of Rule 23, the plaintiffs needed to come forward with some sort of a plan whereby they would identify sufficiently for Rule 23 purposes the definition of the class.

So that made it necessary for them to show -- in other words, how are you going to prevent the individualized exploration of the question with each plaintiff as to whether or not that person had given consent to be called on their cell phone?

I confess that I'm not sure I understand how it is you would go about doing that.

MR. TRENZ:  Well, Your Honor, I apologize if this answer I'm going to give is a bit lengthy, but I think the case you're citing is the Gene and Gene case.

JUDGE DALTON:  It is.  Thank you.  Yes.

MR. TRENZ:  Your Honor, I live in the Fifth Circuit and we're from Texas, so we understand that the courts don't like certification much there.  But the issue with that case, Your Honor, it was a junk fax litigation case; and in the junk fax litigation, they relied on a separate and distinct portion of the T.C.P.A.

These kinds of T.C.P.A. cases rely upon the declaration by the F.C.C. stating exactly what the standard

1 is, and the standard was changed by the F.C.C. such that it

2 is prior expressed consent; and those are terms -- "prior"

3 and "express" are not in the original T.C.P.A. and they were

4 implied differently.  The reason was that in a junk fax

5 litigation, some of the affirmative defenses, Your Honor,

6 were such as if you have a website for your business and you

7 have a fax number on that website, if I could ascertain the

8 fax number from going to your public forum or if you gave

9 cards out, then those would be ways in which it would be

10 permissible to send you what would be, quote, unquote, "a

11 junk fax."

12          So those were the problems that the Gene and Gene

13 court had, because they said, well, there are just too many

14 ways that someone could have gotten your fax number in a

15 legitimate way and then faxed you as a result.  So that's why

16 the court really had an issue with commonality.

17          In this case, it's a little different.  Now, we

18 actually -- to address that, Your Honor, we have -- we

19 believe again, not to re-assert the same thing I just said,

20 but, factually, there's a problem.

21          But, secondly, we also have a second class, an

22 alternative class, definition, if the Court doesn't like your

23 first class definition, and the alternative class definition

24 is very simple.  We know, based on testimony, that E.R.C.

25 essentially does the following.  When they get a group of

accounts in, maybe a million or two million accounts, the

first thing they do is they use vendor resources, Lexus and

there's a few others, that essentially skiptrace to find new

phone numbers that they don't already have, which means

logically that if they didn't have the phone number when they

got the account and then they skiptraced to obtain the phone

number, that this was not a number that was provided to them

by the original creditor, which is the exact kind of conduct

that the F.C.C. states.

They say that prior express consent can only be

obtained if the person or the consumer gave the number to the

original creditor at the inception of the account.

JUDGE DALTON:  So if I understand you correctly, I

just want to make sure I'm following you, that even though I

appreciate it's a fall-back position, that a fall-back

position would be that you could define the class

appropriately to meet the commonality issue by restricting it

to those individuals whose phone numbers were obtained via

skiptrace as opposed to being provided in the original

contract; is that right?

MR. TRENZ:  Yes, Judge, that is and that's because

we feel -- and based on -- and I think that, you know, to

call it a fall-back position is correct, but I think that the

deposition testimony sets out that these are how they get

their numbers.  This is the predominant way, because a lot of

1   the accounts they get are aged accounts.  They are older

2   accounts that have been delinquent for some time.

3           JUDGE DALTON:  Okay.  Thank you.

4           Now, who's here on the Tipoo case?

5           MR. SCHULTZ:  Your Honor, the Tipoo case has been

6   settled.

7           JUDGE DALTON:  Okay.  Has the paperwork been

8   submitted?

9           MR. SCHULTZ:  I don't believe so, Your Honor.  We

10  just got the signed Settlement Agreement.  So I think we

11  still have to make payment to the plaintiff and then submit

12  the dismissal order.

13          JUDGE DALTON:  Okay.  I'll follow up, but let me go

14  ahead and order you to submit the settlement paperwork within

15  45 days from today's date.

16          MR. SCHULTZ:  That won't be a problem, Your Honor.

17          JUDGE DALTON:  Okay.

18          Let's see.  Tipoo is settled.  Phillipson is

19  settled.  Kubat is settled; is that right?

20          MS. MARTIN:  Correct.

21          MR. SCHULTZ:  Correct, Your Honor.

22          JUDGE DALTON:  And is the paperwork in on

23  Phillipson and Kubat?

24          MS. MARTIN:  Yes, Your Honor.  We filed notices of

25  dismissal with the MDL.

```
1              JUDGE DALTON:  Okay.  I don't think I've entered
2    orders yet.
3              Have I entered orders on those?
4              THE COURTROOM DEPUTY:  Not yet.
5              JUDGE DALTON:  Okay.  Well, orders will follow then
6    shortly on Tipoo, Phillipson and Kubat.
7              What about the Aumick case?  Who's here on Aumick?
8              MR. OWENS:  I believe that is -- that Donald
9    Yarbrough's case?
10             It is.  I'm here on behalf of Mr. Yarbrough.
11             JUDGE DALTON:  Is Mr. Yarbrough going to
12   participate?
13             MR. OWENS:  Yes, he is, but, Your Honor, I'm
14   covering for Mr. Yarbrough, who has a conflict here today.
15   So I believe he's pretty much in the same status or the same
16   boat as Drinning-Duffee, but. . .
17             JUDGE DALTON:  Well, Mr. Yarbrough filed a pleading
18   in which he indicated that he had no interest in certifying a
19   class and that he wanted his case handled as a one off.
20             MR. OWENS:  Right.  He's has an individual claim;
21   but he understands that if the Court is inclined to lump this
22   in with the multi-district litigation, then he will defer to
23   the Court.
24             JUDGE DALTON:  Well, I want to make sure that
25   there's no ambiguity, that if you're appointed as lead and
```

1    liaison counsel, that that's going to include representation

2    of the Aumick plaintiffs.

3              MR. OWENS:  It's only for today's hearing, Your

4    Honor.

5              JUDGE DALTON:  Well, that's not going to be

6    acceptable to the Court, is what I'm telling you.

7              MR. OWENS:  Okay.

8              JUDGE DALTON:  The Aumick case is part of this

9    multi-district litigation.  So Mr. Yarbrough is not going to

10   be able to maintain independent representation; and if he's

11   not here today, I'm concerned about where we're going to go

12   with the Aumick case.

13             So I'm not going to permit Mr. Yarbrough to

14   continue to represent the Aumicks in addition to lead and

15   liaison counsel that are appointed for the rest of the class.

16   That's our purpose in being here this morning.

17             MR. OWENS:  Okay.

18             JUDGE DALTON:  I didn't receive any notification

19   from Mr. Yarbrough that he had no plans to attend.

20             MR. OWENS:  Okay.  I will relate same -- I will

21   relate this to Mr. Yarbrough.

22             JUDGE DALTON:  Mr. Latturner, let me ask you to

23   address for a minute this question that Mr. Trenz touched on.

24   I know that the Blake case has proceeded to the point where

25   they've closed their briefing on the class certification.

1    I would envision, at least, the prospect of

2  potentially reopening the briefing on class certification to

3  give you all an opportunity to augment or supplement anything

4  that was filed in connection with the Blake case, but I'd be

5  interested in your thoughts on what additional discovery, if

6  any, might need to be done in connection with the class

7  certification and whether you think that the -- I don't know

8  if you've had a chance to review their briefing on the class

9  certification issue, but whether you think that you all need

10  to make a contribution to that to make to make sure that your

11  clients' interests are adequately represented.

12    MR. LATTURNER:  The only aspects of class

13  certification that we would need new discovery on is that we

14  have also pled two subclasses, one on behalf of Soppet and

15  one on behalf of Tang, which highlights the fact that they

16  had gotten the number assigned to them after the actual

17  debtor dropped it.

18    We believe that that puts them into a unique

19  situation with regard to the liability here, and we would do

20  discovery with regard to what they have -- whatever they --

21  Enhanced Recovery has done to determine whether or not this

22  is an assigned call.

23    JUDGE DALTON:  Well, educate me a little bit on why

24  that would be a different situation than someone whose phone

25  number was provided or obtained by way of skiptracing or some

1    other -- I guess I'm not sure I follow the distinction as to

2    why it's important if Enhanced Recovery obtained a phone

3    number that's some number other than the number that was

4    originally provided by the debtor.  Whether it was obtained

5    through skiptracing or whether it was just inherited by

6    somebody else, why would that make a difference in terms of

7    the responsibility of E.R.C.?

8         MR. LATTURNER:  We firmly believe that a full class

9    should be certified.  If the full class is certified, then

10   there would probably be no need for the subclasses.  It is,

11   in effect, a safety measure with regard to the issue that the

12   Court mentioned earlier on commonality; that if the Court

13   found that commonality was not reached with regard to the

14   entire class, the commonality would be acceptable for the

15   subclass that Soppet and Tang are looking to -- to represent.

16        JUDGE DALTON:  Okay.  How much time do you think

17   you'd need to get that discovery completed, Mr. Latturner?

18        MR. LATTURNER:  I would hope within 45 days.

19        JUDGE DALTON:  Let me hear from the defendants on,

20   what's your view on the status of discovery on the issue of

21   class certification?  Mr. Schultz?

22        MR. SCHULTZ:  Yes, Your Honor.  Each one of these

23   cases, Your Honor, raises, I believe, unique issues; and as

24   we hear counsel articulate, I think it's clear what those

25   issues are.

1      As it relates to the Blake argument, for example,

2 Your Honor, their fall-back position, as they describe it,

3 with the skiptrace numbers, that class wouldn't include

4 Soppet and Tang.

5      JUDGE DALTON:  I think in fairness, I called it

6 their fall-back position.  I'm not sure they embrace that

7 definition.

8      MR. SCHULTZ:  Okay.  Fair enough.  But the Blake

9 class definition wouldn't include Soppet and Tang.

10      We don't know at this point, Your Honor, after

11 litigating the Blake case for several years and taking

12 multiple depositions, whether Latasha Blake even fits within

13 that class definition, because E.R.C. no longer has the

14 ability to determine exactly where they got Latasha Blake's

15 phone number.

16      There is evidence in the record that suggests that

17 they came from the creditor.  There's evidence in the record

18 that it came from a skiptrace.  We don't know.  So there's

19 going to be an issue there as far as whether or not she even

20 meets their proposed class definition.

21      As it relates to Soppet and Tang, Your Honor, that

22 case, by the time that we filed the motion for summary

23 judgment, took it up to the Seventh Circuit, there has been

24 very little classwide discovery.  Counsel and I have talked

25 many times as far as what's going to be necessary.  I think

 1   45 days is extremely optimistic to get this done.

 2            What we're dealing with here, Your Honor, is a very

 3   difficult thing, because under the T.C.P.A., we have a

 4   four-year look back from the time that the first complaint in

 5   this case was filed.  That means we're going back to 2006.

 6            E.R.C.'s policies and procedures for how they

 7   skiptrace numbers and then subsequently dial them through

 8   their dialer have changed.

 9            Up until 2008, the F.C.C. had generally opined that

10   the T.C.P.A. didn't even apply to debt collectors.  In 2008

11   the definition changed a little bit as far as that as well as

12   what the type of equipment is that's covered by the T.C.P.A.

13            In response to that, E.R.C. has modified their

14   policies and procedures.

15            What Mr. Trenz described to you as far as E.R.C.'s

16   policies just isn't true.  He's looking at a window of time.

17   He's ignoring the fact that E.R.C. has developed policies and

18   procedures when they obtain numbers to scrub them, meaning

19   they bump it up against a known database of cell phone

20   numbers; and if those numbers are cell phones, if the scrub

21   comes back positive, they don't get called through their

22   dialer.  They're not left messages, a prerecorded message.

23            So the fact that we've got different various

24   procedures in place at various times is going to affect this

25   whole consent analysis, and whether or not a number was

obtained in 2006 versus 2008 versus 2010 will greatly affect

the analysis as far as whether there is going to be consent.

So there's a lot of different issues that are going

to be needed in discovery; and, unfortunately, E.R.C.

generally doesn't have the ability or the resources of the

documents to show consent.  That's maintained at the creditor

level.

So what we've got is a situation where we might be

able to identify a person that was called through E.R.C.'s

dialer at a number that today is showing up as a cell phone;

and we know that the number came from the creditor, but we

don't know if the consumer gave that number to the creditor.

JUDGE DALTON:  I don't want to cut you short, but I

want to point out to you that while you weren't before the

Court, I think Ms. Martin was.  That's part of what I heard

when I extended the discovery period in the Blake case, was

to give E.R.C. an opportunity to try to avail itself of

whatever resources there were to try to augment the data that

they had available to them, at least as I recall it, and I

could be mistaken; but it's my recollection that that was

part of what was argued at the time that they asked for more

time to complete it there.

So I guess the question I have for you, Mr.

Schultz, is, have you had an opportunity to look at what was

accomplished by your co-counsel in discovery in the Blake

1   case and is any of that useful to you and is there more that

2   needs to be done?  And, if so, tell me what more needs to be

3   done, how you would do it, and how much time it will require.

4           MR. SCHULTZ:  You're absolutely right.  That's

5   exactly what happened in Blake, Your Honor, and I was

6   involved in some aspects of that in Blake, Your Honor, and

7   E.R.C. did do that.

8           The problem you're dealing with is you're dealing

9   with millions of telephone numbers.  So with the time and the

10  resources and the cost involved, there was a limited

11  investigation done by E.R.C.

12          What it required was E.R.C. to take a select number

13  of accounts, figure out in those accounts whether or not

14  there have been cell phone calls and, if so, go with that to

15  the clients.

16          So they went back to ten of their largest

17  creditors, and I believe it was ten different accounts from

18  each of those ten creditors, and they asked them, "You gave

19  us this number.  Can you tell us whether or not you had

20  consent?"

21          And the results from that were ambiguous, at best,

22  Your Honor.  I believe one of their clients came back, on six

23  of the ten, and said, "Yes, we have the number from the

24  creditor," and we described all of that in our motion -- in

25  our position to class certification in Blake, Your Honor.

1          The other -- many of the other clients, the

2    creditor clients, of E.R.C. indicated that they could no

3    longer do that, that they didn't have the resources.

4          Now, Your Honor, my firm handles a lot of T.C.P.A.

5    class action litigation.  We hear that response from these

6    creditors all the time.  Whether -- whether it's AT&T or

7    Citibank or GE Capital, they always tell us that; and it

8    requires usually motion practice and subpoenas and active

9    pushing with the involvement of the court to get the

10   creditors to actually give us the information that we're

11   required to show the consent.

12         So that's why I think -- and that's the step that's

13   necessary, Your Honor.  To answer your question specifically,

14   what it usually requires is us to identify who is potentially

15   in that class, to go to the creditor and say, "Okay.  Here's

16   the 10,000 accounts," or, "Here's the 100,000 accounts that

17   you've given us in the last year," or four years or whatever

18   period of time we're talking about.  "Tell us which one of

19   those accounts did you get that number from your customer,"

20   and then they have to go and do that analysis, Your Honor.

21         That's where really the rubber hits the road,

22   because that's where it gets very difficult and the creditors

23   get very resistant to do that because it's difficult and it's

24   expensive and it's time-consuming.  But that, to me, is the

25   only way that we could do it, because ultimately what it

1    comes down to is the party who has the ability to show

2    consent most likely is the creditor who's not before Your

3    Honor.

4            JUDGE DALTON:  I'm waiting to hear the plan and how

5    long it's going to take.

6            MR. SCHULTZ:  Well, that's the plan.  It would be

7    to go to the -- to go to the -- to go to the creditors and

8    get that information.

9            Your Honor, I would think it's going to take at

10   least, at a minimum, 120 days, and I think that's being

11   optimistic; but if you're asking me for a timeline, I would

12   think 120 days, at a minimum, to identify that.

13           JUDGE DALTON:  Let me ask you a philosophical

14   question, which you may or may not be in a position to

15   answer.  If the Congress intended the T.C.P.A. to provide a

16   remedy for individuals who received an unsolicited, unwanted,

17   unauthorized telephone call from a debt collector to recover

18   damages, why should the inability of the putative violator of

19   the statute or the alleged violator of the statute be

20   entitled to frustrate the process by saying, "You know what?

21   This is just too hard.  It's just too much.  There's too

22   many.  It's too time consuming"?  Doesn't that just

23   completely gut the T.C.P.A.?

24           MR. SCHULTZ:  No, it doesn't, Your Honor.  There is

25   case law on this, and I can't think of the name off the top

1    of my head.  I know it's an appellate court out of

2    New Jersey.  It's Bakers Union or something is the case, but

3    it gives a lot of the history of the T.C.P.A.

4            What Congress -- many courts have found that what

5    Congress intended with the T.C.P.A. was it to be brought in

6    small claims court in state court.  That's why up until the

7    Mims decision last year, there was a split in the circuits as

8    to whether or not there was even federal court jurisdiction

9    under the T.C.P.A., because the statute itself limits it to

10   as otherwise provides by state law.

11           JUDGE DALTON:  So you think the philosophy of the

12   T.C.P.A. was basically it was an individualized remedy, it

13   was intended to be brought by an individual consumer who

14   received an unsolicited call to go to small claims court, to

15   complain about it and could receive -- I don't want to use

16   the term "nominal," but relatively nominal damages?

17           MR. SCHULTZ:  $1500 per call, yes.  But, Your

18   Honor, it's also important to keep in mind that the T.C.P.A.

19   was enacted to deal with telemarketing, and we're not dealing

20   with telemarketing here.  Up until 2003, the F.C.C.

21   specifically exempted debt collection calls from the T.C.P.A.

22   because they said those aren't telemarketing calls.  In 2003

23   the F.C.C. flipped on that.

24           JUDGE DALTON:  What would you say -- I don't know

25   if this is the plaintiffs' argument, but I would anticipate

1   that the plaintiffs would argue that $1500 a pop for the very

2   few people who might seek to avail themselves of the remedies

3   of the T.C.P.A. in small claims court, essentially it's a

4   congressional right enacted with no remedy.  It basically

5   incentivizes large debt collectors to break the law because

6   they know that nobody can put together a class action to

7   address it and make the penalty meaningful.

8          MR. SCHULTZ:  Well, and that would certainly be an

9   argument and it's also a criticism that's also levied at the

10  Fair Debt Collection Practices Act, the other legislation

11  that deals with debt collection.  It's a common lament of the

12  plaintiffs' bar.  But the reality is that's the way Congress

13  enacted it, Your Honor.

14          On the flip side, it certainly raises a due process

15  issue.  If we're talking about millions of calls at 500 or

16  $1500 per call, these cases quickly escalate into the

17  billions of dollars.

18          Then it becomes an issue of is a penalty -- and the

19  case law is pretty clear in finding that the T.C.P.A. remedy

20  is a penalty.  If that penalty is fitting the crime, so to

21  speak, you're going to bankrupt -- I mean, a company like

22  E.R.C. with 300 employees has absolutely no ability

23  whatsoever to pay any judgment that these plaintiffs would

24  ever obtain.

25          If they're ultimately successful here, we're

1    dealing with millions of phone calls, with millions of

2    consumers that would be seeking billions of dollars; and it's

3    just impossible that any company in America today could

4    really ever satisfy a judgment like that.

5            So understanding that there is -- certainly, the

6    plaintiffs have a right to pursue their claims, the T.C.P.A.,

7    if we're talking philosophically, Your Honor, I would argue,

8    is being manipulated since really 2008, when the F.C.C.

9    changed its definitions, as a windfall for plaintiffs'

10   attorneys.

11           JUDGE DALTON:  All right.  Thank you, Mr. Schultz.

12           Mr. Schafer, can I invite you back up.  I should

13   have done this when you were at the podium before, but tell

14   me a little bit about your practice in terms of your

15   qualifications to serve as co-lead counsel.

16           MR. SCHAFER:  Your Honor, I -- my firm has been

17   doing for the last close to ten years primarily consumer

18   protection type work, D.T.P.A., F.D.C.P.A., that type of

19   claim.  We've been co-lead counsel in a small class action in

20   Texas against Baptist Health Care Systems.  We are currently

21   liaison counsel with some other attorneys that represent our

22   client in the Midland case, and that is a T.C.P.A. case, the

23   same case that Mr. Latturner is on.

24           JUDGE DALTON:  And you have no concerns about

25   availability resources in terms of the time that this may

 1    take from you personally?

 2             I do want to make sure that Mr. Latturner and Mr.

 3    Schafer hear me when I say that when we have hearings, lead

 4    counsel, you know, you all co-lead counsel, that means one of

 5    you will need to be here.  Understood?

 6             MR. SCHAFER:  We fully intend to be here every time

 7    you have a hearing, Your Honor.

 8             JUDGE DALTON:  Okay.  Thank you, Mr. Schafer.

 9             Mr. Latturner, would you like to have the

10    opportunity to file some additional briefing on the question

11    of class certification?

12             It's no secret to either of you, I'm obviously

13    concerned about the commonality aspect of it.  I can tell you

14    that the Court would appreciate some additional briefing on

15    it, on this commonality issue and the subclasses that you all

16    described as potential ways to potentially solve the Rule 23

17    problem.  So I'm inviting some additional briefing, and I

18    wanted to know whether you think it would be helpful and, if

19    so, how much time would you need to put together some

20    briefing on the class certification issue?

21             I understand you may have some discovery

22    outstanding.  That's why I don't want to require you to

23    submit briefing before you feel like you have all the facts

24    you need to marshal your arguments.

25             MR. LATTURNER:  Okay.  I agree.  We would seek

1  additional briefing on it.  We are going -- we plan to file a

2  consolidated complaint with a class definition, which will be

3  very similar to the one that we have now.

4         With regard to discovery, given Mr. Schultz's

5  estimate of 120 days, I would suggest that we would have

6  might have to get transcripts and so on.  So 45 days after

7  the 120 days to end discovery; and, of course, the discovery

8  will focus on the concerns raised by the Court.

9         JUDGE DALTON:  From the standpoint of time period

10 in terms of putting some guardrails up in terms of the

11 temporal aspects of the people who could be potentially

12 members of the class, does the Blake filing encompass all of

13 the Soppet and the Tang potential plaintiffs or not?

14         MR. LATTURNER:  The Blake filing encompasses the

15 same class, I believe?  It's a nationwide class for people --

16         JUDGE DALTON:  You are getting some head shakes no

17 over here.  I'm concerned about the four-year look-back.

18         MR. LATTURNER:  The basic class in the Blake case

19 is the same that we are alleging.  We have the subclasses in

20 Tang and Soppet, which are not in there.  It's a different

21 issue as far as commonality and identification, because it's

22 a narrower class and I think it would be much easier to meet

23 the commonality requirement in that, as I had said before;

24 but as far as the basic definition of the main class in

25 Soppet and Tang and the Blake class, that we are on the same

1    page.

2            JUDGE DALTON:  I want to make sure that we are

3    communicating.  I'm talking about the time aspect of the

4    class.  In other words, the four-year look-back of people

5    that could potentially be members of this class, does the

6    Blake class encompass everybody that could potentially be

7    encompassed in the Soppet and Tang class?

8            Mr. Schultz is --

9            MR. SCHULTZ:  Your Honor, I believe I can answer

10   this.  I think what you're asking is filing dates.  The Blake

11   case was filed in December of 2010, Your Honor.  Soppet was

12   filed in October of 2010.

13           So I think as far as the four-year look-back,

14   Soppet and Tang would have the farthest look-back, to October

15   of 2006, whereas Blake would go back to December of '06.

16           MR. LATTURNER:  Everybody within Soppet --

17   everybody in Blake is within the Soppet class.

18           JUDGE DALTON:  But everybody in Soppet is not in

19   Blake?

20           MR. LATTURNER:  There's the two months, yes.

21           MR. SCHULTZ:  Correct.  It would be a two-month

22   window.

23           MR. LATTURNER:  Yes.  And, again, we plan to file

24   an Amended Complaint which refers back to four years from the

25   filing of Soppet.

| | |
|---|---|
| 1 | JUDGE DALTON:  All right.  How much time do you |
| 2 | need to file your consolidated complaint, Mr. Latturner? |
| 3 | MR. LATTURNER:  We should have that within 30 days. |
| 4 | JUDGE DALTON:  Okay.  Have you had many |
| 5 | communications with -- I'm sorry.  Mr. Owens, I've forgotten |
| 6 | the lawyer's name from South Florida in the Aumick case.  Who |
| 7 | is that? |
| 8 | MR. OWENS:  That's Donald Yarbrough. |
| 9 | JUDGE DALTON:  Have you had many communications |
| 10 | with Mr. Yarbrough? |
| 11 | MR. OWENS:  No. |
| 12 | JUDGE DALTON:  All right.  Administratively, I'm |
| 13 | going to grant the request for appointment of co-lead counsel |
| 14 | between Mr. Latturner and Mr. Schafer.  Mr. Schafer and Mr. |
| 15 | Latturner will be designated as co-lead counsel on behalf of |
| 16 | the plaintiff, and Mr. Owens will be designated as the |
| 17 | liaison counsel for the plaintiffs. |
| 18 | I'm going to grant the request of Mr. Schultz and |
| 19 | Ms. Martin to allow you all to appear as co-counsel on behalf |
| 20 | of the defendant.  Again, I want to make the same point, |
| 21 | however, that I made to the plaintiff.  If either of you |
| 22 | appear, you're going to be responsible for anything that |
| 23 | comes up.  So I just want to make sure you know that you |
| 24 | won't have the luxury of being able to say, "Well, Mr. |
| 25 | Schultz is not here," or, "Ms. Martin is not here, and I'm |

1    not prepared to speak to that."

2            Then, Mr. Latturner and Mr. Schafer, I'll give you

3    all 30 days to file your consolidated complaint; and then

4    look for the defense to file a response to the consolidated

5    complaint, to move or answer with respect to the consolidated

6    complaint within 20 days after its filing.  So 30 days for

7    the consolidated complaint, 20 days for a responsive

8    pleading.

9            Then I'll establish a discovery schedule of 120

10   days from today's date for additional discovery with respect

11   to the class certification issues.

12           At the close of that discovery period, then I'll

13   give you, Mr. Latturner, 45 days to submit a consolidated

14   motion and supporting memorandum on the issue of class

15   certification, noting that I am particularly concerned about

16   the commonality issue.  I want you to address all of the

17   issues of Rule 23, but I am interested in ascertaining

18   whether or not there's a plan that the Court -- that's a

19   well-defined plan that the Court can see to solve the

20   commonality problem.

21           Mr. Trenz, it may be that the argument that you

22   made is the plan.  So I'm not being dismissive of the

23   argument that you made, but I do want to make sure that

24   that's addressed comprehensively in your filing.

25           So I'll give you 45 days after the close of

1  discovery to submit your consolidated brief on the class

2  certification issue, focusing on commonality; and then I'll

3  give the defendants 14 days after that is submitted by the

4  plaintiffs to file your memorandum in opposition.

5          I suspect most of that work on your part is already

6  done; but, again, focus on the commonality aspect of the

7  Rule 23 requirements would be helpful.  I'm sure that'll be

8  evident when the plaintiffs make their submission.

9          Let's see if there's anything else we need to do.

10          In light of the fact that you all need some

11  additional time for discovery and that you're going to be

12  filing a consolidated complaint, I don't think it's -- I

13  don't think that there would be any purpose in holding a

14  status conference, at least until we get the pleadings

15  resolved.

16          Unless you all think otherwise, I would probably be

17  inclined to -- let's see.  This is February.  We would not

18  need to have a status conference in March, and we'll

19  tentatively put a status conference down that I'll get out a

20  notice on in April.

21          Mr. Latturner on behalf of the plaintiffs and

22  either Ms. Martin or Mr. Schultz, if you all would make a

23  submission within ten days of that date as to whether or not

24  you think there's anything to be done at the status

25  conference in April.  If there's not, let me know that and I

1   won't haul you in here for no purpose; but if there are

2   issues that need to be addressed in April, my interest is

3   making sure that we don't lose big blocks of time without

4   activity.  I want to keep the case moving towards resolution.

5   So if you have discovery issues, obviously, Judge Kelly is

6   available to address those.

7           If you have issues in April that are discovery

8   related or if you have issues that come up prior to that in

9   which you think a March status conference would be helpful,

10  just file something with me to bring it to my attention.  If

11  they're discovery-related, I'll ask Judge Kelly to hold a

12  status conference.  If it's some combination of discovery and

13  substantive issues, then we may take the bench together or we

14  may decide between us that one of us will handle it.

15          In any event, let me hear from you all.  As I said,

16  I would not anticipate we would need a March meeting; but if

17  you think otherwise, just bring it to my attention and we'll

18  schedule it.

19          I know Judge Kelly will make himself available if

20  you have discovery issues, because our principal goal is, as

21  I said, to keep the case moving forward towards resolution

22  and not find ourselves at a status conference where we've

23  lost 120 days and have really not advanced the ball down the

24  court.

25          Is there anything else?

1          MR. SCHULTZ:  Your Honor, if I may?  One of the

2    things we discussed and have been discussing, and it might be

3    evident by the fact that three of these seven cases have been

4    consolidated here, is a global resolution of these cases.

5          As Ms. Martin explained, there are some insurance

6    carrier issues involved here.  We have been trying since -- I

7    think it's fair to say since September of last year to

8    schedule mediation.  E.R.C. is interested.  I believe all

9    plaintiffs' counsel are also interested.

10         We had some problems, though, with the various

11   insurance companies, figuring out who owed coverage on which

12   claims beginning when.

13         Since September, one of the carriers has agreed

14   that they will attend in good faith a mediation.  A second

15   insurance company has not yet reached that conclusion.

16   They're still not sure what their coverage position is going

17   to be.

18         What we had discussed -- and this was the

19   defendants' proposal -- would be continuing the stay that

20   this Court has put in place already on discovery for another

21   60 days to give us an opportunity to mediate the case; and

22   the reason why, Your Honor, is, as hopefully I've been able

23   to explain, the discovery here is going to be expensive and

24   disruptive.

25         It's not good for my client's business to harass

their clients and ask them for documents and advertise the

fact that they're being sued.  It's bad business.  So they're

trying to minimize that as much as possible and focus in on

trying to get the case settled.

So what we were hoping to do, Your Honor, was I've

been advised that the insurance company should have a

finalized coverage decision within 45 or 60 days.  Give us

that time to schedule mediation.  We have already identified

a mediator we'd like to use, the plaintiffs and us.  We've

identified a location for that mediation.

What I would suggest is we schedule it for a little

bit after 60 days out to give that insurance company time,

and then maybe we can mediate this case in, say, early May.

If we don't get the case settled at that point in time, then

my clients had a full opportunity to resolve the case and

they understand the risk and they understand that now they're

going to have to go to their clients and do this full-bore

discovery.

JUDGE DALTON:  All right.  Thank you, Mr. Schultz.

Mr. Latturner or Mr. Schafer, do either of you have

a view on the 60-day continuation of the stay to allow the

case to get mediated?

MR. LATTURNER:  We have no problem with that.  We

think both sides understand the issues; and any mediation

would also have to reach an agreement on the class and how

1  they are identified, which will moot all of the commonality

2  issues because they will be agreed to.  So we would support

3  that.

4           JUDGE DALTON:  Well, I agree.  I think it would be

5  very productive.  Obviously, I'm all in favor of anything

6  that might result in a resolution of the case.

7           But let's do this.  I am concerned about giving

8  your carrier, Mr. Schultz -- and I don't mean this

9  disparagingly -- some incentive to get their decision-making

10  people together.  So what I am going to do is order that

11  mediation occur within 60 days from today's date.

12           I am going to require all the interested defense

13  counsel to have a representative present with full authority

14  to make decisions with respect to resolving the case and to

15  make decisions with respect to coverage.

16           So you can communicate that to your client, whether

17  it's Ms. Martin are whether it's Mr. Schultz.  I don't know

18  if your clients -- whether you talk to both or you talk to

19  them individually.

20           So within the next 60 days, a mediation will be

21  scheduled.  I'll certainly leave it to you all to work out

22  the choice of mediator and the location and the timing,

23  unless you need our help on that.  If you do, contact Judge

24  Kelly's chambers and he'll enter any appropriate orders that

25  might be necessary if these folks need to be further

1    encouraged.

2         I will issue an order after today outlining the

3    time periods.  What I will do is continue the stay for 60

4    days to allow you to mediate it, and then I'll stagger the

5    days.  In other words, I'll just push back the days that I

6    announced in open court to allow for that 60-day stay period

7    and we'll go from there.

8         What I would ask the parties to do is if they

9    anticipate problems with respect to getting the carrier's

10   cooperation or getting it scheduled or anything that might --

11   in other words, I don't want to hear on day 59 that you

12   weren't able to get the mediation scheduled.  So I'd like to

13   get a status report from you within 30 days from today.  If

14   you would, file a status with the Court indicating where you

15   are in terms of scheduling the mediation.

16        It seems reasonable to me that within 30 days you

17   ought to be able to have the logistics worked out and then

18   the last 30 days you ought to be able to accomplish the

19   mediation.

20        So if you'll file something within 30 days telling

21   me the when, where, how and who of the mediation, then I'll

22   look forward to a report after the culmination of the

23   mediation, with a status reporting that you all have gotten

24   it all worked out and it's all settled and you can go on to

25   bigger and better things, all right?

44

1          Mr. Ranlett.

2          MR. RANLETT:  Just to clarify, Your Honor, at some

3   point when you were describing the schedule and who has to

4   attend the mediation, you referred to defendants in the

5   plural.  I take it that you did not intend to order AT&T to

6   file class cert briefing or to appear at the mediation before

7   the arbitration issue has been finally resolved?

8          JUDGE DALTON:  I'm not requiring that you file

9   anything with respect to class certification; but I am going

10  to order AT&T to have a representative at the mediation, if

11  the mediation is going to go forward.  You're obviously not

12  obligated to make any offer, but you are a party to the case;

13  and as long as you are a party to the case, if you filed your

14  arbitration motion and if it's been ruled on in that 60-day

15  period, then obviously that'll moot it; but I suspect that's

16  probably not going to happen.

17          So I am going to require AT&T to have a

18  representative present at the mediation.  Whether you

19  participate in a meaningful way or not will be up to your

20  representative.

21          MR. RANLETT:  Thank you for that clarification.

22  One last question then.

23          JUDGE DALTON:  Surely.

24          MR. RANLETT:  I had understood the Court to suggest

25  that there would be a continuance for roughly 60 days for

 1    this mediation, and then there would be a time period where

 2    the plaintiffs would file a consolidated complaint; and then

 3    after that, the defendants would be responding to that

 4    consolidated complaint, which is when I thought Your Honor

 5    would have preferred AT&T to file its motion to compel

 6    arbitration; but now I think I understand Your Honor is

 7    suggesting that maybe AT&T should file its motion to compel

 8    arbitration earlier, before the mediation.  What would the

 9    Court prefer, Your Honor?

10         JUDGE DALTON:  Yes, I would like you to go ahead

11    and make your submissions with respect to the issue of

12    arbitration and then -- that's only in which case?

13         MR. RANLETT:  In the Soppet case, Your Honor.

14         JUDGE DALTON:  In the Soppet case.

15         So then, Mr. Latturner, you can address the

16    arbitration issue on behalf of your clients Soppet and Tang,

17    and that'll be separate and apart from the class maneuvering,

18    all right?

19         MR. RANLETT:  Thank you, Your Honor.

20         JUDGE DALTON:  It seems to me we need to figure

21    out, what are we going to do with AT&T?

22         You can make a decision yourself.  I'm not

23    encouraging you one way or the other to keep them in or to

24    let them go, but I do think that we need to resolve this

25    question of arbitration before AT&T gets too far down the

```
 1    road in terms of time and expense.  If they are entitled to
 2    arbitrate their issues, then the Court needs to address that
 3    early on.
 4            MR. OWENS:  Your Honor, just one point of
 5    clarification.  Since Your Honor has already put into place a
 6    timeline with respect to class certification and mediation,
 7    will it be necessary for plaintiffs to file a motion to set
 8    aside, I guess, the local Rule 4.04, which imposes its own
 9    deadlines with respect to class certification?
10            JUDGE DALTON:  No.  The deadlines that I just
11    described to you will be controlling, not the local rules.
12            MR. OWENS:  All right.  Thank you, Your Honor.
13            JUDGE DALTON:  We're going to continue the stay for
14    60 days.  At the end of that -- for mediation purposes.
15            So let's recap.  We're going to get a status report
16    from you all within 30 days as to whether or not there are
17    any problems with the mediation and that it's been scheduled.
18    The stay is going to stay in place for 60 days to allow the
19    mediation to occur.
20            Within 30 days, the plaintiffs are going to file a
21    consolidated complaint.  Twenty days thereafter, the
22    defendants are going to file a response to the consolidated
23    complaint.
24            The discovery period will commence at the
25    expiration of the 60 days for mediation and will continue for
```

1    120 days thereafter.  At the close of discovery, the

2    plaintiffs will have 45 days to submit a consolidated brief

3    on the class certification issue.

4          The defendants will have 14 days from the date of

5    that filing to file their response.  I think that's it.

6          I'm going to look to AT&T -- I'm not going to

7    establish any time schedule.  I'm assuming that it would be

8    in AT&T's interest to advance the interest of arbitration on

9    their calendar.  So we'll handle that independent of the

10   briefing schedule that I just described for the class

11   certification.

12         MR. LATTURNER:  If I may ask a clarification

13   question?

14         JUDGE DALTON:  Yes, sir.

15         MR. LATTURNER:  We would be willing to file our

16   consolidated complaint within 30 days from today.  I am not

17   sure if you are saying to stay that until after the

18   discovery.

19         JUDGE DALTON:  No, no.  I'm staying discovery, not

20   the pleadings.  Let's get the pleadings settled, and there's

21   no reason that we can't do that.  We're not talking about a

22   lot of time and expense from your clients to get that done;

23   and I think, frankly, it might help better frame the issues

24   for mediation if you've got your consolidated complaint

25   filed.

1      JUDGE KELLY:  The only thing I would add is that if

2   your mediation effort is unsuccessful, you need to move

3   forward with discovery with deliberate speed.  Our local

4   rules require you to have a good-faith conference before you

5   bring issues to the Court, but that conference should not

6   unnecessarily delay presenting issues to the Court.  So

7   everyone on both sides needs to be responsive to any request

8   to have a dialogue in order to narrow the discovery issues or

9   to resolve those issues.

10      Even if, after the expiration of the period for

11   mediation, the parties are continuing to have settlement

12   discussions, that should not delay the progress of the case.

13      So you'd have a 120-day period to complete

14   discovery and that seems pretty short.  So everybody would

15   have to be on their game in order to resolve the issues and

16   present any issues to the Court in a timely manner so that

17   everything could be resolved within that window.

18      So I'd just ask for your cooperation if the

19   mediation efforts prove unsuccessful, okay?

20      JUDGE DALTON:  I think that's good advice.  In

21   other words, during this 60-day period, even though discovery

22   is stayed, there's no reason that you all can't be

23   formulating what your discovery plan is, figure out who it is

24   that you need to depose, even exchanging dates and getting

25   things set out in the future.  There's no reason to wait

1   until day 61 to start doing that work, because what you're

2   hearing from Judge Kelly is -- you need to hear this message

3   from the Court -- is that this is a reasonable amount of

4   time, but this time will go by quickly; but if you haven't

5   acted with dispatch, it's not going to be very availing to

6   come back to the Court and say, "Now we need more time

7   because we didn't get started until day 61."

8          The other thing, Mr. Owens -- and Mr. Yarbrough is

9   not here, but Judge Kelly reminded me of something that was

10  on my list -- I want you to communicate to Mr. Yarbrough, Mr.

11  Owens, the importance of being familiar with our local rules

12  and the need to meet and confer before motions are submitted

13  to the Court.

14         And I want to make sure the parties understand, and

15  it's particularly important when you all are in different

16  geographical regions, is that "meet and confer" means pick up

17  the telephone and talk to one another, not e-mail swaps.  If

18  you can swap e-mails and reach an accord, that's fine; but if

19  you swap e-mails and you're not successful in working it out,

20  pick up the telephone and speak to one another, all right?

21         Just know that if you file a motion and the motion

22  recites compliance with Rule 3.01(g) and says, "We e-mailed

23  each other and we didn't get a response," the motion is

24  denied.  "E-mailed each other and couldn't work it out," the

25  motion is going to be denied.  Just fair warning.

 1                It happens sometimes motions get filed at the

 2       eleventh hour and it's, you know, "I tried to reach Ms.

 3       Martin, but she was off."  I mean, you all need to work on

 4       that, plan them in advance, and just know that if you file a

 5       3.01(g) certification that doesn't reflect that you've

 6       actually spoken to your adversary, that the Court's going to

 7       deny it, okay?

 8                Well, thank you all for coming in.  I appreciate

 9       it.  And best of luck in your efforts to get the case

10       mediated successfully.

11                Mr. Schultz, please don't be shy.

12                And that goes for you, Mr. Latturner and Mr.

13       Schafer, as well.  Reach out to Judge Kelly if you think that

14       the Court can be of any assistance whatsoever in terms of

15       your efforts to get it mediated.

16                We don't want to intrude if you all are getting

17       along well and things are working out; but if you think the

18       Court's involvement in either scheduling or making sure that

19       the parties know what it is that's expected of them at a

20       mediation, I know Judge Kelly would be happy to help you out

21       with that.

22                We'll be in recess.

23                (Proceedings terminated at 11:05 a.m.)

24                     - - - - - - - -

25                   Reporter's Certification

*Diane Peede, RMR, CRR (407) 615-0305*

1      I certify that the foregoing is a correct transcript from the

2      record of proceedings in the above-entitled matter.

3                                    s/Diane Peede, RMR, CRR
                                     Official Court Reporter
4                                    United States District Court
       Date:  March 11, 2013         Middle District of Florida
5