### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**IN RE ENHANCED RECOVERY
COMPANY, LLC, TELEPHONE
CONSUMER PROTECTION ACT
LITIGATION**

**Case No. 6:13-MD-2398-Orl-37GJK**
**(MDL No. 2398)**

**This document Relates to all actions.**

_____

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF FINAL APPROVAL
### OF CLASS ACTION SETTLEMENT AGREEMENT

Plaintiffs LATASHA BLAKE, WANETT DRINNING-DUFFEE, RONNIE DUFFEE,

TERESA SOPPET, and LOIDY TANG (collectively "Plaintiffs"), respectfully submit this

memorandum in support of final approval of their settlement for injunctive relief under Rule

23(b)(2) with Defendant Enhanced Recovery Company, LLC ("ERC" ). This Court granted

preliminary approval to the parties settlement agreement ("Agreement") on March 26, 2014

(Docket Entry, "D.E." 119).

## I.    OVERVIEW OF THE CASE

This consolidated Telephone Consumer Protection Act ("TCPA") class action against

ERC grows out of four cases transferred to this Court on October 8, 2012 by the Judicial Panel

on Multidistrict Litigation ("JPML"). (D.E. 20.)  Plaintiff Soppet brought the first case on

August 30, 2010 in the Northern District of Illinois; plaintiff Tang filed her case in the same

court on October 12, 2010. The cases were subsequently consolidated for all purposes on

December 2, 2010. Plaintiff Blake filed her action on December 23, 2010 in the Central District

of Florida and the Drinning-Duffee case was filed in the same court on June 11, 2012. All

plaintiffs claim that ERC violated the TCPA when it called their cellular telephones without their consent using an automated telephone dialing system and/or an artificial voice.

Prior to the JPML transfer, there was significant activity in the *Soppet/Tang* and *Blake* cases. In *Soppet/Tang*, the plaintiffs alleged that ERC called them in an effort to collect AT&T debts which were owed by persons who *previously* had plaintiffs' cell phone numbers, but relinquished those numbers some three to five years prior to ERC's calls to plaintiffs. After the parties conducted merits discovery, ERC moved for summary judgment, which the district court denied.  ERC filed an interlocutory appeal and  the Seventh Circuit affirmed the district court's ruling, holding that, under the TCPA, the "called party"  refers to "the person subscribing to the called number at the time the call is made." *Soppet v. Enhanced Recovery Company, LLC*, 679 F.3d 637, 643 (7th Cir. 2012), discussing 47 U.S.C. § 227(b)(1)(A).

On remand, Soppet and Tang filed a First Amended Consolidated Complaint naming Illinois Bell Telephone Company d/b/a AT&T Illinois ("AT&T Illinois") as an additional defendant.

The *Blake* case was similarly active.  In that case, Plaintiff conducted extensive class and merits discovery.  She also fully briefed and filed a motion for class certification, Plaintiff was forced to file a motion to compel further discovery responses and a motion for contempt and sanctions before ERC finally produced requested documents.  Once ERC had produced these voluminous records, Plaintiff was, at the Court's request, instructed to file a second motion for class certification, utilizing the newly obtained discovery. Blake retained an expert to analyze the substantial number of documents ultimately produced by ERC.  This matter fell under the auspices of the JPML prior to any decision on Blake's second class certification motion.

The *Drinning-Duffee* was in its early stages of litigation prior to the inception of the JPML transfer to this Court.

After transfer, the cases were stayed pending mediation on May 23-24, 2013. The parties had begun discussing potential settlement terms well before the mediation and those discussions continued through the date of the preliminary fairness hearing on October 1, 2014.

## II.   THE ADMINISTRATION OF THE SETTLEMENT

### A.   The Preliminary Approval Order.

This Court's Preliminary Approval Order found that the proposed terms of the settlement satisfied all of the elements of Federal Rule of Civil Procedure 23(a) and 23(b)(2) and preliminarily certified a class defined as:

> All persons within the United States (a) who, on or after August 30, 2006, (b) received any telephone call from Defendant Enhanced Recovery Company ("ERC") or its agents to said person's cellular telephone made through the use of any automatic telephone dialing system or with an artificial or prerecorded voice, (c) which call was not made for emergency purposes, (d) where ERC's records do not show that the person provided the number to ERC or the original creditor (for example, where the number was obtained through skip tracing or captured by ERC's equipment from an inbound call).

The Order also established a procedural framework for the final approval of the settlement, provided for notice, set deadlines and procedures for Settlement Class Members to submit objections to the Agreement, and set a date and time for the fairness hearing. (D.E. 119.)

### B.   The Sending of Class Notice.

Although Rule 23(b)(2) does not require notice to be sent to class members, Class Counsel caused extensive notice of the settlement to be given in order to advise class members of their rights. Notice of this settlement has been specifically and methodically disseminated to persons and parties that were most likely to *know* or have access to the class members. Class

3

Counsel worked with ERC's counsel to establish an extensive list of attorneys and groups around the country that would be most likely to know these potential class members. These proposed groups were included in the Parties' Joint Motion for Settlement. (D.E. 105.)

Between January 10 and January 15, 2013, notice of the settlement of this action was sent by e-mail and facsimile to 167 legal aid societies around the country. (Declaration of Brian Trenz, ¶ 2, Exhibit 1.)  Notice was also provided to the Attorneys General of each of the fifty states.  In fact, on January 15, 2014, the parties discussed the specific terms of the settlement with representatives of at least five  attorneys' general on a conference call.

Subsequently, in April 2014, Class Counsel sent additional notice to approximately 400 consumer bankruptcy attorneys and approximately 500 consumer credit counseling organizations around the country.  (Declaration of Brian Trenz, ¶ 8, Exhibit 1.)

Notice was further promulgated via a website at .

As of the June 24, 2014 deadline, no objection to the parties' proposed settlement was filed by any class member.

**C.     The Value of the Settlement to the Class is Significant.**

**1.     The Injunction Provides Significant Relief**

The Agreement provides injunctive relief to the Class consisting of three components: 1) changes in how ERC obtains and memorializes the receipt of consent from consumers to receive auto-dialed calls on their cell phones; 2) changes in ERC's policies and procedures for training staff in complying with the TCPA; and 3) a two year reporting period in which ERC is to certify its compliance with the injunction on a quarterly basis.

The specific requirements of the injunction are as follows:

a.     Injunctive Relief Parameters.

(1)     Defendant shall strictly log and categorize consent.

(2)     Defendant shall strictly and routinely search and scrub every number provided to it by the original creditor to determine if it is a cellular telephone number and keep a log of said numbers.

(3)     If Defendant obtains any new telephone numbers for debtors from any source (relatives, public resources, skip tracing, etc.), then those numbers must be scrubbed utilizing reasonable procedures to determine which phone numbers are cellular telephone numbers.

(4)     For each number identified as a cellular telephone number or for which Defendant does or may know to be a cellular telephone number, said number cannot be called utilizing Defendant's auto-dialer unless there is prior express consent.

(5)     For each cellular telephone number wherein Defendant does not have concrete evidence of consent, Defendant must hand-dial the number until ERC is able to obtain prior express consent.

(6)     Prior express consent must be clear and must be formally stated by the debtor in question.

(7)     Prior express consent must be clearly and conspicuously noted in the computer system utilized by Defendant's debt collectors.

b.      Injunction Oversight and Reporting.  Defendant shall make a bi-annual report to Class Counsel outlining its compliance with the injunction and any issues that may have arisen. ERC agrees to submit copies of any putative individual or class action lawsuits filed against it during the reporting period to Class Counsel.

c.      Injunction Training and Supervision.  Defendant must incorporate into its employee handbooks sufficient training regarding the TCPA.  Defendant must devote classes and training for new and current debt collection employees as well as supervisory staff concerning: the TCPA, the meaning of, and how to obtain, prior express consent as defined by the TCPA, the effect and statutory damages permitted under the TCPA, and prudent procedures for use and application of phone numbers obtained by debt

> collection employees during normal collection efforts. Defendant
> shall create a new TCPA compliance manager (who may be a
> current employee of Defendant) who shall review the training
> information, work to train staff, oversee debt collection practices
> and their TCPA compliance or lack thereof.
> (See Agreement, § 2.2.)

Last, but certainly not least, Class members have been notified of their right to bring

individual TCPA actions against ERC and to collect all actual and statutory damages to which

they would be entitled in the absence of this Settlement. Although the injunctive relief is a

significant benefit to all Class members because it serves to reduce further violations of the

TCPA, the fact that each Class member's right to recover individual damages remains

unextinguished is truly significant. The combined relief of the injunction and retention of their

right to sue makes this a highly unusual but valuable settlement for each and every Class

member.

### 2.      Lead Plaintiffs' Incentive Awards Are Reasonable.

The Settlement Agreement provides that each of the five plaintiffs is to receive $10,000

for his or her statutory damages and services as a representative of the Class (for a total of

$50,000). This amount is reasonable in light of the number of wrongful calls received by each

Lead Plaintiff. Plaintiffs Soppet and Tang received 25 and 29 calls respectively, while Plaintiff

Blake received 18 calls, and Plaintiffs Drinning-Duffee and Duffee 17 calls respectively.[1]

### 3.      Payment to Class Counsel is Less Than Their Collective Lodestar.

The Settlement Agreement provides for the payment of $1.25 million to Class Counsel.

This amount is reasonable in light of protracted nature of the litigation, the heavily litigated

individual class cases, *and* in light of Class Counsel's collective lodestar, which exceeds $1.25

---

[1] Plaintiffs Soppet and Tang have separately settled their claims against defendant
Illinois Bell Telephone Company d/b/a/ AT&T Illinois on an individual basis.

million.  Further discussion and support for Class Counsel's fee request is detailed below, in

Section IV of this Motion.

## III.    THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT

Final approval is warranted because 1) the Class meets all the requirements of Rule 23,

subsections (a) and (b), *and* 2) the Agreement is fair, reasonable, and adequate.

### A.    The Class Should Be Certified Pursuant to Rules 23(a) and (b)(2)

Under Rule 23, each of the four requirements of Rule 23(a) must be satisfied and one of

the three elements of Rule 23(b) must be satisfied to certify a class. *Vega v. T-Mobile USA, Inc.,*

564 F.3d 1256, 1265 (11th Cir. 2009); *Klay v. Humana, Inc*., 382 F. 3d 1241, 1250 (11th Cir.

2004). *See also Bush v. Calloway Consol. Grp. River City Inc.*, 2012 WL 1016871 (M.D. Fla

Mar. 26, 2012) (Dalton, Jr. J.). The proposed class fully satisfies all the requirements of Rule

23(a) and 23(b)(2).

Class actions for TCPA violations are often deemed appropriate by Courts across the

country.  Cases such as this one which allege violations of the TCPA are particularly well-suited

for class treatment due to the nature of the violation. *See, e.g.,*: *Meyer v. Portfolio Recovery

Associates, LLC,* 707 F.3d 1036 (9th Cir.  2012); *Manno v. Healthcare Revenue Recovery Group,

LLC*, 289 F.R.D. 674 (S.D. Fla. 2013); *Mitchem v Illinois Collection Serv.*, 271 F.R.D. 617 (N.D.

Ill. 2011); *Balbarin v. North Star Capital Acquisition, LLC,*, 10 C 1846, 2011 U.S. Dist. LEXIS

686 (N.D. Ill., Jan. 5, 2011), later opinion, 2011 U.S. Dist. LEXIS 5763 (N.D. Ill., Jan. 21,

2011), later opinion, 2011 U.S. Dist. LEXIS 58761 (N.D. Ill., June 1, 2011); *Lo v. Oxnard

European Motors, LLC*, 11CV1009 JLS (MDD), 2012 U.S. Dist. LEXIS 73983 (S.D. Cal., May

29, 2012) (a settlement class).

## 1.    The Requirements of Rule 23(a) Are Met

### a.    Numerosity and Impracticability

Although Rule 23(a)(1) is commonly understood as the "numerosity" requirement, it might more appropriately be viewed as the "impracticality" requirement. *Armstead v. Pingree*, 629 F. Supp. 273, 279 (M.D. Fla.1986); 1 William Rubenstein, Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 3:3 (4th ed. and Supp. 2010). Thus, the question hinges not on the specific number of purported class members, but rather on whether joinder is impracticable. *Id.*

Surpassing the numerosity requirement is a very low threshold.  The Eleventh Circuit generally holds that "less than twenty-one is inadequate, more than forty adequate." *Cheny v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D.Fla.2003) (quoting *Cox v. Am. Cast Iron Pipe Co*., 784 F.2d 1546, 1553 (11th Cir.1986)).

The putative Class members in this matter far surpass the Eleventh Circuit's requirements. ***In Blake, plaintiff identified 3.5 million unique cellular telephone numbers that ERC called during a six month period alone, with absolutely no evidence of consent.*** Those 3.5 million unique cellular telephone numbers were derived from a sampling of telephone calls made by ERC during a six-month period. Extrapolating this data for the 7 year class period, it is likely that the Class could number in the tens of millions. The impracticability requirement of Rule 23(a) is clearly satisfied.

### b.    Commonality

Rule 23(a)(2)'s commonality prerequisite requires at least one issue of law *or* fact be common to all members of the class. It "does not require that all of the questions of law or fact raised by the case be common to all the plaintiffs",  (*Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315,

325 (S.D. Fla.1996)), but can be satisfied if "[d]efendants have engaged in a standardized course of conduct that affects all class members." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 687 (S.D. Fla.2004); *Agan v. Katzman & Korr*, P.A., 222 F.R.D. 692, 697 (S.D. Fla.2004); *In re Amerifirst Sec. Litig.,* 139 F.R.D. 423, 428 (S.D. Fla.1991); *Kornburg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (finding a sufficient nexus where the "claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory.")

Here, Settlement Class members share issues of both law and fact. The issue of law is whether ERC violated the TCPA. The issue of fact is whether ERC called the cellular telephones of Settlement Class members without their consent using an automated telephone dialing system and/or an artificial voice.  Discovery in the *Blake* case revealed that ERC's policy and practice was to skip-trace phone numbers and robo-dial at will, without any regard to whether or not the number called was a cell phone number. This is certainly an issue of fact common to the class.

Where a defendant engages in standardized conduct -- such as it did here  – courts are likely to certify a class. *Williams v. Mohawk Industries, Inc.*, 568 F.3d 1350 (11th Cir. 2009). Courts in the Eleventh Circuit have called commonality a "low hurdle" and identified that a "pattern" of practice was sufficient to satisfy this prong.  *Id.* at 1357.  *See also*, *Holtzman v. Turza*, 2009 WL 3334909 (N.D.Ill. October 16, 2009); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, 2009 WL 2581324 (N.D. Ill. August 20, 2009); *Am. Home Servs. Inc. v. A Fast Sign Co., Inc.*, 287 Ga.App. 161, 651 S.E.2d 119, 2007 WL 2265578 (2007); *Transp. Inst. v. Seattle PC-Magic, Inc.,* 2005 WL 5267529 (Wash.Super. June 8, 2005); *Whitting Corp. v. Sungard Corbel, Inc*., 2005 WL 5569575 (Ill. Cir. Nov.9, 2005).

### c.     Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class. Typicality differs from commonality in that it focuses on the named class representative's individual characteristics in comparison to the proposed class. *Piazza v. Ebsco Indus. Co.*, 273 F.3d 1341, 1346 (11th Cir. 2001); *Prado-Steiman v. Bush*, 221 F.3d 1266, 1269 (11th Cir. 2000) (class representative must possess the same interest and suffer the same injury as the class members, *Id.* at 1279.) "The test for typicality, like commonality, is not demanding." *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 532 (M.D.Fla.1996).

Here, a sufficient nexus exists between the named Plaintiffs and the Settlement Class members. Plaintiffs and Settlement Class members seek relief under the same statute - the TCPA. The claims of Plaintiffs and Settlement Class members are identical in that their core claims stem from allegations that they received robo-calls from ERC on their cellular telephones without having provided prior express consent to receive such call.

Plaintiffs have no interests that differ from the Settlement Class Members.

### d.     Adequacy

Rule 23(a)(4) requires a showing that the "representative parties will fairly and adequately protect the interests of the class." FRCP 23(a)(4). To adequately represent a class, a named plaintiff must show that she possesses the integrity and personal characteristics necessary to act in a fiduciary role representing the interests of the class, and has no interests antagonistic to the interests of the class. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir.1987).

Plaintiffs' interests are not antagonistic to those of the Settlement Class members. The injunctive relief provided by the Agreement will *equally* serve both Plaintiffs and the Settlement Class members by protecting them from future calls which violate the TCPA. Plaintiffs have also all expressed a willingness to pursue an appropriate settlement on behalf of their fellow class members, as evidenced by their ongoing patience and perseverance over three long years of litigation.

Rule 23(a)(4) also mandates that Class Counsel be deemed adequate. Here, Class Counsel is a conglomeration of highly experienced attorneys with an established background in successful litigation of consumer cases around the country.

Counsel for *Soppet/Tang* have been litigating this case since 2010, successfully defeating Defendant's motion for summary judgment and obtaining a favorable ruling from the Seventh Circuit Court of Appeals. (Declaration of Francis R. Greene, Exhibit 2.) They also have a long and established history of successful results in TCPA and other related consumer litigation class actions. (Declaration of James O. Latturner, Exhibit 3.)

Likewise, Blake's counsel has also been heavily involved in this case since 2010, conducting discovery, analyzing voluminous data and documents, and engaging in extensive law and motion practice before this Court. (Declaration of David Schafer, ¶¶ 3-9, Exhibit 4.) Blake's counsel also has experience litigating TCPA and other consumer matters and has used this background to aggressively pursue their client's claims in this lawsuit. (Decl. Schafer, ¶¶ 3-13.) (Declaration of Kira Rubel, ¶¶ 5-22, Exhibit 5.)

Counsel for *Drinning-Duffee* have been litigating on behalf of their clients since 2012 and, while the *Drinning-Duffee* litigation has been less contentious than its sister cases, *Drinning-Duffee* counsel have been no less vigorous in pursuing their clients' claims throughout

mediation and settlement.  Like their counterparts, *Drinning-Duffee* counsel have extensive experience and background in litigating consumer matters.  (Declaration of Scott D Owens, ¶¶ 1-12, Exhibit 6.)  (Declaration of Keith Keogh, ¶¶ 1-21, Exhibit 7.)

Class Counsels' collective knowledge and experience, together with their dogged representation of their clients over nearly four years, is evidence of their adequacy.

### 2.    The Requirements of Rule 23(b)(2) Are Met

Rule 23(b)(2) provides for certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FRCP 23(b)(2).

Plaintiffs seek this Court's approval of an injunction which effectively prevents ERC from calling the cellular telephones of Settlement Class Members in violation of the TCPA.  This injunction applies not only to debts ERC has attempted to collect in the past from Settlement Class Members but any debt ERC may attempt to collect from anyone in the future.

This Settlement is particularly well-suited for a settlement under the auspices of Rule 23(b)(2) because ERC has acted "on grounds generally applicable to the class" by engaging in a pattern of robo-calling the cellular telephones of debtors and non-debtors alike without their prior express consent. Plaintiffs allege, and discovery has confirmed, that ERC obtained cellular telephone numbers from outside vendors that used "skip-tracing" to find the numbers. Skip-tracing is often used when the telephone number provided by the creditor to the debt collector is no longer valid.  Discovery has also confirmed that ERC failed to maintain a log indicating how cell numbers were acquired by ERC, including whether they were acquired through the prior express consent of the debtor. If the numbers were obtained through skip-tracing, it is likely that

the debtor did not provide prior express consent to receive robo-calls to their cell phones. ERC's course of conduct was applied uniformly to all Settlement Class members and the injunctive relief provided for in the Agreement will redress the group-wide injury and properly serve the remedial nature of the TCPA.  *See, Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 162 (2nd Cir. 2001).

Since obtaining a monetary recovery for the Settlement Class members pursuant to Rule 23(b)(3) is impractical (given that there are undoubtedly millions of class members and ERC lacks the financial wherewithal to fund a multi-million dollar settlement), a settlement under Rule 23(b)(2) is the superior method to fairly and efficiently adjudicate the claims of the Settlement Class.[2] Furthermore, and importantly, this settlement does not extinguish each class member's right to pursue statutory damages, like most settlements under the TCPA.

**B.     The Court Should Grant Final Approval to the Settlement Agreement Because It Is Fair, Reasonable, and Adequate**

In assessing the fairness of a class settlement, the Eleventh Circuit has held that courts should consider six factors:

1. The existence of fraud or collusion behind the settlement;
2. The complexity, expense, and likely duration of the litigation;
3. The stage of the proceedings and the amount of discovery completed;
4. The probability of the plaintiffs' success on the merits;
5. The range of possible recovery; AND
6. The opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1345 (S.D. Fla. 2011)

(citing *Leverso v. South Trust Bank of AL, N.A.*, 18 F.3d 1527, 1530n6 (11th Cir. 1994).

These six factors militate in favor of approval of the Agreement.

***Factor One - The settlement was reached without fraud or collusion***

[2] Prior to the entry of the preliminary approval order, ERC provided information to the Court relating to its financial condition.

There is a presumption of good faith in the negotiation process. *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014). Where the parties have negotiated at arm's length, in adversarial fashion, the court will generally find that the settlement is not the product of collusion. *Id.*  Moreover, where parties have taken discovery and negotiated settlement over a long period of time, there is less likelihood of fraud or collusion. *Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988), *aff'd*, 893 F.2d 347 (11th Cir. 1989).

Here, there can be no doubt that the parties' settlement was *not* the result of fraud or collusion. The negotiations can best be characterized as antagonistic, rather than collusive.  The *Soppet/Tang* and *Blake* cases were vigorously litigated for three years before a settlement was even broached. After the transfer of the cases by the JPML, the parties' arms-length settlement negotiations began *prior* to their May, 2013 mediation and *continued* until this Court's involvement at the preliminary fairness hearing on October 1, 2013. Collusion had no part in this settlement.

### *Factor Two - The complexity, expense, and likely duration of the litigation*

Courts regard a settlement favorably if it avoids further protracted and expensive litigation. *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 469 (S.D. Fla. 2002). ("[A]bsent settlement, this matter clearly will require a protracted and expensive trial and appeal, under circumstances where the ultimate results are highly uncertain. The parties, therefore, have good cause to settle this matter, another factor favoring this Court's approval of the settlement agreement.")

Here, this litigation had been pending for three years at the time the parties had reached agreement on all points of the Settlement Agreement after the October 1, 2013 preliminary fairness hearing. If the parties had not settled, both would have needed to take additional class

and merits discovery, plaintiffs would have moved for class certification and, if successful, they would have moved for summary judgment. In the event plaintiffs' motion for summary judgment was not successful, there would have been a trial and possibly an appeal, all of which would have lasted for years. Under the circumstances, the parties had good reason to settle the case.

### Factor Three - The stage of the proceedings and the amount of discovery completed

As discussed above, plaintiffs' counsel in the *Soppet/Tang* and *Blake* cases had engaged in substantial merits and class discovery prior to settlement. Accordingly, Plaintiffs had attained sufficient knowledge about the strength and weakness of their cases when they began negotiating the settlement. *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d at 1348-1349 ("Courts also consider 'the degree of case development that class counsel have accomplished prior to settlement' to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating.")

### Factors 4 & 5 - The probability of the plaintiffs' success on the merits and the range of possible recovery

The fourth and fifth factors are "the likelihood and extent of any recovery from the defendants absent . . . settlement and whether a settlement is fair in light of the potential range of recovery." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1349-50 (S.D. Fla. 2011). The "fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate. This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Id.* at 1350 (internal quotations, citations omitted).

Here, Plaintiffs believe that there was a high probability that they would have ultimately prevailed on liability. (ERC's motion for summary judgment was denied in the *Soppet/Tang*

case.) However, it would have been extraordinarily difficult to obtain monetary relief for Class members due to the size of the class and ERC's inability to pay a class-wide judgment for so many Class members. This factor supports approval of the settlement.

Subsequent to the preliminary fairness hearing, ERC submitted evidence to the Court that, neither through its own resources nor its insurance, could it adequately fund a settlement for a class of millions of people. For the same reason, ERC did not have the financial ability to send either direct or publication notice to the class.

Finally, even if ERC had been able to fund a settlement that provided a meaningful recovery to each individual class member, it would not have been possible to determine the identity of the putative class members from ERC's records. ERC may have made 25 million unauthorized calls to cell phones during the class period. Because many, if not most, of those cell phone numbers were "skip-traced", it is probable that many of those numbers did not belong to the actual debtor, but rather a friend or relative or people who acquired the cell phone number after the debtor relinquished it, making identification of each Class member impossible. Moreover, discovery in the *Blake* case revealed that ERC had been overwriting data from old call records, thus many of its records were no longer in existence and those that still existed were incomplete and inaccurate .[3]

---

[3] Blake took the deposition of ERC's Chief Information Officer, David M. Bernstein, who testified that ERC had 50 million individual archived accounts. The 50 million accounts, however, did not represent the whole of the Class because ERC had deleted, either by agreement or as a regular business practice, many of the accounts of putative class members. Mr. Bernstein testified that it would cost ERC thousands of dollars per month to increase its file storage to preserve evidence for this case and, even with that increased storage space, it could not afford to store account data relating to each potential class member for the number of years it would take for this case to conclude. Mr. Bernstein further testified that contracts with original creditors mandated deletion of account information within a certain period of time. Due to those contractual mandates, Defendant did in fact delete a portion of its archived account data.

Because certification of the class would have been difficult and obtaining monetary relief for all Class members would have been financially prohibitive as well as technically impossible, the fourth and fifth factors support approving the parties Rule 23(b)(2) settlement.

> **Factor Six - The opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.**

The final factor weighing in favor of approval of the Settlement Agreement is the opinion of Class Counsel and Plaintiffs and the amount of opposition to the settlement. "In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.' " *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1351 (internal citations omitted).

For all the reasons set forth in this brief and, especially, the discussion in the last section, Class Counsel believes this is a fair, adequate, and reasonable settlement and, indeed, the best settlement that could have been obtained under the circumstances. Moreover, ***no Settlement Class Member or third party has submitted any objection to the Agreement.*** Accordingly, this last factor weighs heavily in support of the Court's approval of the settlement.

## IV.    <u>THE ATTORNEY'S FEES AND COSTS ARE REASONABLE</u>

The Agreement provides for payment of $1,250,000 to Class Counsel for their attorneys' fees and costs. Class Counsel, who are experienced class action attorneys, request that the Court approve the payment of that sum because of the benefits obtained for the Settlement Class Members by the Agreement and also because their collective lodestar exceeds $1,250,000.

Class counsel have collectively expended a significant amount of time and effort on this case.  Edelman, Combs, Latturner & Goodwin, LLC filed the initial case in this litigation on behalf of plaintiff, Teresa Soppet. The Law Offices of Curtis Warner and the Burke Law Offices,

LLC filed the second case on behalf of plaintiff, Loidy Tang. Together, the three law firms took class and merits discovery, briefed ERC's motion for summary judgment, and briefed ERC's appeal of the denial of its motion for summary judgment. In this Court, Mr. Latturner was named co-lead counsel and he, and Francis R. Greene, have been involved in all facets of the litigation and settlement of the case in this Court.  (Decl. Greene, ¶ ?, Exhibit 2.)  As set forth more fully in the attached declaration of James O. Latturner, the lodestar of Edelman, Combs, Latturner & Goodwin, LLC is $342,301.67 ($335,956.00 in fees and $6,345.67 in costs), the lodestar of the Warner Law Firm, LLC is $96,286.76 ($93,842 in fees and $2,440.76 in costs), and the lodestar of Burke Law Offices, LLC is $36,360 (fees only). (Decl. Latturner, p. 17 and Appendix J, Exhibit 3), (Declaration of Curtis Warner, ¶ 29, Exhibit 8), (Declaration of Alex Burke, ¶ 3, Exhibit 9.)

The case brought on behalf of Latasha Blake by the Law Offices of David Schafer and the Law Offices of Kira M. Rubel was filed on December 23, 2010. Together the firms took class and merits discovery, conducted several depositions, filed a motion to compel and a motion for contempt and sanctions, and filed two motions for class certification. Blake's Counsel was also required to hire an expert to review and evaluate the massive volume of data they received from ERC.  Thereafter, the case was consolidated with the other cases transferred to this Court by the JPML; David Schafer was named co-lead counsel, and Ms. Rubel and Mr. Trenz were active throughout the ensuing extended settlement negotiations as well as the finalizing of the settlement.

As set forth more fully in the attached declarations attached to this motion, the lodestar of the Law Offices of David Schafer is $383,826.50 ($369,682.50 in fees and $14,144.00 in costs)

and the lodestar of the Law Offices of Kira Rubel is $312,090 in fees and costs. (Decl. Schafer, ¶15, Exhibit 4), (Declaration of Brian Trenz, ¶ 17, Exhibit 10), (Decl. Rubel ¶ 23, Exhibit 5).

The case brought on behalf of Wannett Drinning-Duffee and Ronnie Duffee by Keogh Law Ltd. and the Law Offices of Scott D. Owens was filed on June 11, 2012 in the Middle District of Florida. Shortly after the filing of the complaint, the case was consolidated with the other cases transferred to this Court by the JPML. In this Court, Scott D. Owens was appointed liaison counsel. The lodestar of the Keogh Law Ltd. is $41,467.50 in fees, while the lodestar of Scott D. Owens is $43,515 in fees. (Decl. Keogh, ¶ 22, Exhibit 7), (Decl. Owens, ¶ 15, Exhibit 6.)

In light of the time and expenses incurred collectively by Class Counsel, which totals $1,255,843.43, Class Counsel's request for attorneys' fees and costs of $1,250,000 is extremely reasonable. Class Counsel respectfully requests this Court's approval of $1,250,000.00 by the Court.

**V.   CONCLUSION**

For all the foregoing reasons, Plaintiffs, individually and on behalf of themselves and all others similarly situated, by Class Counsel, respectfully request that this Court grant final approval of the Agreement and enter the Final Approval Order, attached hereto as Exhibit 11.

Respectfully submitted,

s/ James O. Latturner
James O. Latturner
EDELMAN, COMBS, LATTURNER &
GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, IL 60603

s/ David P. Schafer

David P. Schafer
Law Office of David Schafer, PLLC
2139 N.W. Military HWY
San Antonio, TX 78213
Lead Counsel for Plaintiffs

s/ Scott David Owens
Law Office of Scott David Owens, Esq.
664 East Hallandale Beach Blvd.
Ft. Lauderdale, FL 33309
Liaison Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of July, 2014, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

s/ James O. Latturner
James O. Latturner